two years, he's been deprived of Internet access. Can't even have a cell phone with wireless. And in this day and age, Your Honor, it's almost as if he's been locked in a closet except it's a closet in a home that he pays rent on and not a jail cell.

But I would ask Your Honor to reconsider whether the 42-to-48-month range is still too harsh. And I want to say that I don't mean to sound ungrateful. I know the Court has agonized over this. And I know that if he were a child pornography obsessed pervert, 42 to 48 months would sound really good, but for Keith Gartenlaub, it's still too high.

Your Honor, after what he's been through, after the bizarre origination of this case that lead to nothing with regard to the secret FISA warrant, after the evidence this Court saw at trial which revealed that there is simply no evidence that he ever looked at the stuff, exchanged it, utilized it, altered it, added to it, I would ask Your Honor to give him an additional period of house arrest and allow him then to move on with his life. And he's always been responsible in the way he's handled this case and he'll continue to responsible in response to any Court orders. Submitted.

THE COURT: Okay. All right. Let me hear from the government.

MR. LEWIS: Yes, Your Honor.

First, I'd like to talk about the guidelines and then some of the other questions that the Court raised and that counsel brought up. The government agrees with the amended PSR, however, the government's recommendation remains the same. And I know the Court's tentative position, but I want to explain what the government's position is on that.

The jury has convicted Mr. Gartenlaub of receipt. And although a technical reading of the guidelines yields the lower range, inasmuch as the guidelines call for the Court to consider acquitted conduct and uncharged conduct, the government feels that it would ignore the policies and objectives of the guidelines for the Court to not at least consider the range, the higher range that applies for receipt.

And a sentence of 120 months is between the new range for possession alone and the old range for receipt. Where the only reason we are here is because of a theoretical possibility that the same devices could have been used to engage in the conduct underlying both offenses.

As far as the date of the receipt conduct, this was not ancient history for the defendant. Although, counsel said numerous times that it wasn't altered in those 14 years, it was. Mr. Pixley testified that the filings were changed, that new folders were created, that files were moved between different folders, that new copies were made. And over that

time period in which it was in defendant's possession, there are a series of deliberate choices and actions he took that show that he wanted to keep it.

Mr. Pixley also testified that there were settings on the viewer that were used that showed he wasn't able to record when new viewings occurred. So looking at the fact that shortly afterwards, he made -- after they were received in 2002, he made three copies in 2005 and 2006. He then moved them onto, copies of that Aridge data library on to new computers that he bought.

THE COURT: I understand that that's the evidence. My question to you, though, is there anything in the record that suggests that child pornography beyond what was moved around on the computers, what was originally there in 2004 was added?

MR. LEWIS: No, Your Honor.

THE COURT: Okay.

MR. LEWIS: But to add to that, Your Honor, in 2013 on the new computer he bought, it was not the old one that was collecting mold as counsel referred to, the new computer he bought, he put two new copies of Aridge data on it. And Your Honor after looking at the disputed log files that were going to go to the jury saw what those file names were.

THE COURT: I understand and I agree that there was evidence from which the jury could decide to convict

Mr. Gartenlaub. And I know Mr. Werksman disagrees, but that's exactly why I didn't grant a new trial and have made the rulings that I've made.

Now, I'm at sentencing and now, I have to deal with the problem that this is not the ordinary case. In fact, it's not like any other case I've seen involving either possession or viewing of child pornography because we have a static world of pornographic files and they haven't changed over time which is just not -- it's unheard of.

MR. LEWIS: I would agree with Your Honor that that is an atypical characteristic among many other unique characteristics in this case. But that collection was cultivated and maintained. He did not throw it out. He did not shelve it after he initially acquired it. He sort of continued to reorganize.

THE COURT: You certainly produced evidence to that effect, yes.

MR. LEWIS: Then I will move on to a couple of the other issues that were raised. One of which is a comparison to the Su Bin case, which is just an apt comparison here.

THE COURT: I'm not trying to compare it. I'm just putting it in the context. I know that it would be impermissible for me to compare this case to the Su Bin case because the charges are different. The government charged Mr. Gartenlaub with possession and distribution of child

pornography. Those were not the Su Bin charges and they carry different guideline sentences so I understand that.

MR. LEWIS: Yes, Your Honor.

As for what the collection was that Mr. Gartenlaub had, I do want to note that things that were in it that he copied as recently as 2013 which were young girls tied up in bondage, children just a few years old, that there were videos that were 30 minutes long when five minutes alone is an aggravating factor. And although screened from the jury's views, the file names had illegal in some of them.

I do want to point out, Your Honor, Mr. Fishbach did not offer any testimony at trial. The only trial testimony there was was by Mr. Pixley as far as forensic evidence.

THE COURT: I think that's right and I probably misspoke.

MR. LEWIS: And what I want to close with, Your Honor, is that while there are mitigating factors here, the age of the receipt, the lack of criminal history, there are aggravating ones in addition to that collection including that defendant still has not taken any responsibility or shown any remorse. And the statement of facts that were provided to the Probation Office were essentially pointing fingers at others for the conduct that the jury convicted him of.

THE COURT: I understand that. I guess, though, in my lexicon because I think this defendant intends to appeal his conviction, he is somewhat hamstrung in terms of taking responsibility as you would suggest, and that's not unique to Mr. Gartenlaub. That's the fact that every defendant on earth. He can't possibly admit responsibility, and I'm not suggesting he should, but I'm saying he cannot without severely jeopardizing his appeal.

So, you know, it's for me a little difficult to understand how you can demand acceptance of responsibility in these circumstances because I don't know what his mindset is. We know that he denies that he engaged in the conduct he was convicted of and he intends to appeal his conviction. And so I don't think I can hold it against him is all I'm saying.

MR. LEWIS: I understand that, Your Honor, and I apologize. I may have put it too strongly. I do want to draw a distinction between being silent on the matter and pointing the finger at someone else in the context of sentencing.

THE COURT: I understand. Well, I don't think he's pointed the finger at someone else. My problem is, look, what I have to fashion here, and no one in this room is going to agree with me, but I have to look at the circumstances here and say is this like the other child pornography cases that are contemplated by the guidelines.

And for the reasons I've articulated, it's a different case. It doesn't mean there should be no custodial time. It doesn't mean I agree with Mr. Werksman in that regard. I may, to be frank, entertain a motion to stay sentencing pending an appeal, but I'm just not sure what I'll think about that. I throw that out there.

I do think that under 3553(A), I've got to look and see if there's a basis for a variance. I've already articulated that I think there is. And then the question becomes what sentence is sufficient to punish this defendant. And as I've said earlier on, I think 42 to 48 months is appropriate range. I probably would lean in the direction of 42 months rather than 48.

But this just is not like another case. It is different in a lot of ways. Some of the differences are as you argue irrelevant because it really doesn't matter how the case began. The question is did the government do what it was supposed to do in terms of getting the warrant to go back the second time.

And I spent a long time looking at all that stuff and concluded that the government did exactly what it was required to do. And that's why I denied the motion to suppress and the motion to dismiss the indictment. Obviously, an appellate court may disagree with me, but I certainly was firmly convinced that the government did what

it should do and, obviously, the jury found a basis to convict.

I am here now and I have to deal with the sentencing factors. And as I say, I think it's out of the heartland. I think Mr. Gartenlaub has been involved in treatment and rehabilitation and those are significant factors. So I am prepared to accept, if you think it appropriate, that the guideline range is the range that was originally argued for 135 to 168 months.

Given my finding, however, on August 1st vacating the lesser included offense, it seems to me that I am no longer bound by any mandatory minimum in the case by virtue of that. So then I have to look at the range and whether I see the range 135 to 168 or 87 to 108 months, we still have a criminal history category of one.

A pretty much unblemished prior history. There was an arrest in his youth, but other than that, I think we have a situation where Mr. Gartenlaub is a true Category 1 criminal history individual and he's had a productive life up until these sets of events. So I have to ask myself what is the sentence that I think is sufficient, but not overly harsh in light of the crime of which he's been convicted and that's what my thinking is.

Obviously, it may be that Mr. Gartenlaub wishes to be heard, and I've obviously read all the letters and

everything else.

MR. LEWIS: Your Honor, may I bring up two brief points?

THE COURT: Please.

MR. LEWIS: First, I believe that the correct guidelines are the lower guidelines. I only meant to indicate that the Court should be considering the others as well.

THE COURT: So you agree that they're 87 to 108 months?

MR. LEWIS: Yes, Your Honor.

THE COURT: Okay. Thank you.

MR. LEWIS: And if the Court has additional questions on restitution, my co-counsel, Ms. Chou will address them.

THE COURT: I'm happy to hear on restitution because I'm not quite sure what your position is. I don't know if we have any victims present at this point in time. I've read your restitution papers.

MS. CHOU: Your Honor, there are no victims present, but there has been a request that the government read in two of the victim impact statements. One from the victim and one from the victim's parents. If the Court would like to do that now, then I can explain the legal side of restitution.

The first statement is from the Vicki series victim. She writes I live every day with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life and taking grotesque pleasure in them. I'm a victim of the worst kind of exploitation, child porn. Unlike other forms of exploitation, this one is never ending.

Every day people are trading and sharing videos of me as a little girl being raped in the most sadistic way. They don't know me, but they have seen every part. They are being entertained by my shame and pain.

My world came crashing down the day I learned that pictures of me being sexually abused had been circulated on the Internet. Since then little has changed except my understanding that the distribution of these pictures grows bigger and bigger by the day and there's nothing I can do about it. The enormity of this has added to my grief and pain and given me a paranoia.

I wonder if the people I know have seen these images. I wonder if the men I pass in the grocery store have seen them. I feel totally out of control. They trading around my trauma like treats at a party and it feels like I'm being raped all over again by every one of them.

It sickens me to the core, terrifies me and makes me want to cry. So many nights I have cried myself to sleep

thinking of a stranger somewhere staring at their computer with images of a naked me on the screen. I have nightmares about it often.

I can never feel safe so long as my images are out there. Every time they are downloaded, I am exploited again. My privacy is breached and I feel in danger again. I fear that any of them may try to find me and do something to me.

I have a right to know who has my pictures and who's trading them. While it hurts to know, not knowing makes me feel more in danger. To be criticized for wanting to know what is going with the humiliating pictures of me, to exercise the few rights I have under the law, only makes the hurt that much worse. How can such people not understand or care?

I am justified in my paranoia. Some of these perverts have contacted me. I've received emails suggesting making porn with these strangers and one has stalked me. Another has created a slide show of me on YouTube.

As I go on with my life, the effects of these crimes still hurt me and I hope the Court and everyone involved will understand this and how serious it is. While the abuse was awful, as time goes on, that is farther and farther away from me. He's in jail and can never hurt me. That is over.

The men that download my pictures are all around me

for all I know and it will keep going on forever. I have no control over it at all. This is frightening beyond belief. I still have nightmares that come from knowing that pictures of me are spread around the Internet by people with perverted interests in my pain.

I have panic attacks and flashbacks. I can't sleep a lot of nights no matter how early I go to bed or how early I wake up in the morning. Even if I've barely slept for days and I'm exhausted, sleep doesn't come easy. I take afternoon naps just to function, but something about the nighttime puts my mind on alert. And after all these years and going to different counselors, I still haven't learned a trick to let my mind rest.

When I do sleep, my dreams are vivid and I remember them for weeks. The common theme is finding myself naked in front of a crowd of people or in an enclosed space and I can't escape or run away fast enough. Most days I can put away the thoughts of the previous night and function okay, but some days I get stuck and zone out.

When this happens, I sit in the same spot motionless for a long time. My mind will come back at some point later in the day maybe 30 minutes later or maybe six hours later. I can't remember what I did during that time, but I look around my apartment for clues. This happens a few days out of the month. More frequently if I'm under a lot of

stress.

I've left my home in the zoned out state of mind a few times. Friends and family who've seen me in this state describe me as loopy and tell me they can talk me out of it by pointing out my odd behavior and talking me through some deep breaths. They've told me my personality changes when this happens. I can't remember things I've said in that state and when they repeat them back to me, it's really surprising. I've struggled off and on with this which I now know is called disassociating.

This last year I fell under such stress, I started zoning out or disassociating a few times a week and having the personality issues so bad that my friends were really concerned about me. They kept telling me I wasn't acting normal especially at night.

I've missed a lot of the first two weeks of school so I had the added stress of trying to catch up. I felt like I couldn't control it. I never knew when I was going to zone out and I kept missing class and appointments. It seems crazy, but it took me a long time to recognize what was going on and to get myself to start working on my coping skills again.

School has been a struggle. I've had to quit two different times. I cannot attend a regular college away from home due to my paranoia. Over the last year, I have been

disassociating and missing classes. This puts me behind and hurts my grades. I'm doing my best to salvage my grades and do all the extra credit I can to compensate.

My struggle with sleep due to the fear of unknown people watching my images and coming after me compounds all the other problems. It frustrates me because I hate the feeling of being out of control. Yet these effects can get triggered when I least expect it.

My paranoia about pornography and panic attacks have so far made a serious relationship beyond my capabilities. The paranoia of knowing people are viewing videos of me messes with my mind and adds a back-burner type of stress to my life constantly that is brought to the front of my mind by unexpected situations and still throws me for a loop.

The episodes of disassociation and personality change have benefited from stress management. Many of my PTSD symptoms have gotten better. One thing that has gotten worse is that the stress affects my health and makes me sick. I sometimes stress out to the point of not being able to keep food down for days. It also seems to wear down my immune system because I seem to be getting sick more often.

In my effort to counteract this, I try to work on doing regular exercise, eating healthy and taking vitamins every day. I want you to know that dealing with the effects

of the stress of random me looking at pictures of my sex abuse as a child is like a full-time job that wears me down and colors every aspect of my life.

Please think of me and what I am going through.

And this was sworn in 2012 March.

THE COURT: Okay.

MR. LEWIS: And then she's added supplements in 2013 to make clear that each additional time another person downloads and sees the computer images that are now known as the Vicki series, it does me immeasurable additional harm. I'm hurt every time I hear about another criminal case that involves my images.

With each criminal case I hear about, I know that many more copies of my images are spread around the Internet. I know that there is a lesser and lesser chance that the horror I feel about people seeing me in this way will ever end. It seems the cases will never stop coming.

With each one, I have more to talk to my therapist about. I don't know if I will never not need a therapist. I hope that someday there will be no more new cases, and I can then see an end to therapy that is my lifeline now, but so far that does not seem to be possible.

Despite feeling hurt each time I learn about another case with my images, I feel strongly that I have a right to know about every case. My attorney keeps me up to

date on there being notices coming in with new and ongoing cases. Even though we don't talk about the details of each case, I do know that additional notices about new cases are coming in.

Each one means an additional hurt to me. That hurt is over and above the general aching in my heart that is always there. It tells me that someone else is enjoying my pain. It may be hard for someone else to understand, but I feel that by knowing about the cases, even though it hurts, it helps better protect myself in some small way.

My knowledge that this defendant was among those who both downloaded, looked at and enjoyed the pictures of me at most vulnerable have caused me more and real psychological and emotional hurt and harm.

And then in September of 2013 is her last supplement where she writes, Dear Judge, I'm writing to let you know that I'm still having emotional and psychological problems due to knowing that the images of me being abused as a child are circulating freely on the Internet.

I'm attending counseling or don't need it any more. That is very far from the truth. I have been in counseling over the last several years and am continuing on. Many of my same problems remain, but I have made good progress in dealing with the disassociation problems that I've had in the past.

I've recently gotten married and with this change to a new stage in my life, I have found I have a new set of emotional challenges. I also have a stepdaughter who is just two years old. I see myself in her in so many ways and this triggers many concerns I have about keeping her safe because the amount of people who are downloading images of me. Because of this, I know that the world is not a safe place for children.

Knowing that there are so many out there who have taken pleasure in my pain has also interfered with my intimacy with my husband. The images which were intimately flashing in my waking thoughts or in my nightmares are now more frequent as my martial relationship brings up things that trigger these symptoms for me.

I know now that my life will always be an emotional roller coaster because of the public nature of my own private hell. Even though I know this and can see it coming, it is very hard to bear. Counseling is a rock for me and helps me hang on to what stability that I can.

I'm still focused on my schooling so that I can become a counselor and psychologist myself one day and help other children who have been abused. I have to take it more slowly than other students do as I still find that I cannot attend open classes in the usual manner.

I have not found a job that I can do and feel safe.

I've not been able to work because of the panic attacks I get when working in public or the intrusive questions that always seem to come from co-workers in my small town. The restitution which I receive is very important to allow me to pay for the extra schooling and to take the place of the income I would have received had I been able to work and comport myself in this process.

All the statements and impact statements I've given before are still true for me. As I go on with my life, the effects of these crimes still hurt me, and I want the Court and everyone involved in the child pornography cases to understand this and how serious it is.

Thank you for reading my statement and considering me and the effects of this crime on me.

THE COURT: Thank you.

MS. CHOU: And then they requested the letters from the parents as well. The first letter is from her mother dated October 1st, 2010.

Your Honor, ladies and gentlemen of the court, my daughter was raped and sexually abused in so many horrible ways as a child by and the name is redacted. He also videotaped her abuse as he ravaged, raped and pillaged her ten-year-old body. This sick man shared these repulsive pictures and videos of her on the Internet for perverts like himself to see.

The sexual abuse suffered at the hands of this man without a doubt started her agonizing pain, but this is certainly not where her pain ends or mine. Yes, the memories and trauma of her abuse still haunt her and our family, but now there is a new abuser. The new abusers are the sick individuals who download her pictures and enjoy watching her being sexually assaulted as a child. This sickens me.

Every time these pictures of my daughter are looked at and passed around, the depraved people doing this are furthering my daughter's pain, shame and abuse. They pass it around like some dirty magazine when in fact it's the footage of an abused, helpless child. There are days when the pain from this is unbearable. These vile people increase her pain and mine.

These are certainly not the hopes and dreams I had for my little girl. This life of pain and shame is so terribly sad and painful to watch her struggle with this. These awful people are raping my little girl all over again by cruelly enjoying her pain and deriving some sick sexual pleasure out of it.

The knowledge of this sends me into mourning. Mourning the loss of my child's dignity and well being and mourning the fact that she suffers such deep pain. I've watched her suffer so much already and it kills me. I have to watch her suffer still at the hands of people wanting to

view the nightmare of her abuse as her innocence was being robbed.

She was a child and helpless and made to do disgusting things she did not want to do. Approval from that man came only when she carried out his every dirty command. He posed her, insisted she say certain things and made her force a smile as he was brutalizing her. When I think of my daughter being groomed and posed and made to feel so dirty in these perverted and depraved pictures and videos, it hurts me to the core.

I wonder how there can be people that could actually enjoy watching my little girl being raped and sexually abused. I wish they knew how much it hurts and how much they are worsening our pain. Knowing that these disturbing videos of her and her abuse are being viewed and are continuing to foster this corrupt sexual behavior bring a lot of pain, stress and shame to her.

At the cost of her dignity, modesty and innocence, people viewing those images of her are furthering the terrible addiction of child pornography for themselves and others they pass it on to. Those images are not who my daughter is or ever wanted to be.

But because she was robbed of her innocence, forced to do ugly things and it was videotaped, she's continually being viewed as someone she is not. She's in fact the

opposite. These offenders are still victimizing and torturing her, bringing pain and shame every time they look at those images of her.

As her mother, I share in the heartbreaking pain and the sadness this brings to me is unending. These viewers need to understand that there is a helpless little girl on the other side of these videos whose innocence and childhood were shattered. And viewing these things makes them part of the abuse and unimaginable pain my daughter and her family have to face all the time.

Making, viewing and downloading child pornography is wrong and a crime. I hope everyone can know that child pornography is not a victimless crime by the statement I've shared with you about my daughter and her family's constant pain and struggle.

Now, as a young adult, my daughter's life is still very hard and she still struggles so much due to her sexual abuse and it being constantly viewed. I also struggle. It is so devastating to know your child's life has been brutalized. And to make matters worse has been released to the public for any deviant at the press of a button to view and continue the sickening process of enjoying my daughter's pain.

Although, she is making progress and growing stronger, it still has a major grip on her life as it also

does on mine. She has never had a boyfriend because of trust issues and fear of relationships. She does very well in college and is trying to open herself up more to her friends and fellow students. It is going to be a continuing process.

She feels like she is marked with a scarlet letter because of her victimization and rape marking her with shame. The pornographic images of her are out there continually being viewed and will continue to be forever.

If I could quote my daughter in something she often said when describing how she feels about these people downloading her images. If you can imagine having a bad picture of yourself taken, one that you're really embarrassed about. Now, picture yourself naked being raped and abused and hurt at the age of 9 or 10.

Your pictures of abuse in the hands of someone else are now being viewed for anyone to see at the touch of a button on a computer. These viewers are interacting with your images of abuse. That's how she feels every day wondering who is going to see her next.

As I write this impact statement, I find myself hurting because of the emotional strain and pain that comes from reliving this horrible, ongoing crime that terribly affects me and my family. It's a huge part every day of my life and my daughter's life knowing her images of abuse are being traded, viewed and interacted with by sick people using

her nine-year-old body as a sexual thrill.

To know these perverted people want to partake in and are excited about the horror of your child's little body being raped over and over again makes me so sick. These viewers know she is a child. They can very clearly see that. It makes no difference to them. They're the reason my daughter and our family have to keep reliving this horror of her abuse because they keep it going. They keep viewing it and passing it on to others.

She didn't have a choice. They do. Their choice is traumatizing my daughter and exploiting the broken pieces of her life. These viewers made the choice to descend so low as to rape her with their eyes and with their minds as she was being robbed of her innocence at nine years old.

I feel robbed every time I get notified of another case involving my daughter's images. I feel like some part of her is being taken and abused and used every time I hear of another perpetrator. Can you imagine how hard it is for her to regain her self-esteem, dignity and well-being?

It confuses me that some people in powerful positions can believe this is a victimless crime. Not only is our daughter a victim, but our family is also. As her mother, the sadness of what's happened to her and what's still happening to her is unending. They say time is the healer of all wounds, but I've yet to feel this pain subside.

Child pornography is a crime. Those viewing it are committing a crime to always hurt the child or children who are involved. It is destructive in every way to the viewer as well. This crime needs to have severe consequences because of the devastating pain, fear and shame it causes children. This pain does not end for the child or the families, but continues on for the rest of their lives.

I wish I could take away my daughter's pain and give her back what has been stolen from her. I cannot so I am asking for accountability from the individuals who have hurt her and are continuing to hurt her. For my daughter and countless others who are victims of such a terrible and painful crime, please grant us justice today.

And from her stepfather also October 2010. He writes, to whom it may concern. My family has endured five years to date of a living hell because of the selfish, perverted actions of a very sick and evil individual. My daughter lived with this pain and trauma for six years prior unable to tell anyone because of the fear she had for that man.

We thought we were dealing with one bad apple, but as time goes by, we are finding that there are more and more of these sick individuals that are viewing and sickly satisfying their awful desires. We still have the haunting memories of the letters in the mail and emails letting us

know of all the individuals that are being prosecuted because they have our daughter's images, child pornographic images on their computer.

We don't receive the notices any more. The pain and gut-wrenching reminder of receiving enough notices to over flow a 55-gallon drum are more than my family can take.

It's also unfathomable to know that there are so many perverts in this country and around the world. It sickens me and hurts me to the core knowing that so many perverts are viewing my little daughter as she was made to dress up like a hooker and is molested and raped time and time again.

I'm heart broken knowing that I couldn't protect my daughter. The letters and emails brought that pain up again and again and I couldn't deal with that. Knowing her innocence has been torn away and now how she is continually reminded that her pictures will be there forever, this father's heart is broken.

My daughter carries this shame like a scarlet letter. She knows that if a friend or acquaintance looks her up on the Internet, they are going to find the ugly, horrible, awful history that eats away at her self-esteem and paralyzes her and inhibits her ability to function at school and as a normal young adult.

She knows that this is a challenge that she has to

live with, but the horrible trauma continues to take a toll on her body and soul. The constant reminder that her pictures are out there brings forward the guilt and shame which cause nightmares and makes her want to isolate herself from others. Each time she hears about these cases, she looks so strong on the outside, but when you sit and talk with her, you see the pain, you hear the struggles and feel the sadness, despair and the emotional drain that it causes.

My family is asking for justice with each case that is brought forward with these perverted individuals. We are hoping and praying that they can understand how wrong they are and how hurtful their actions are for each victim in the pictures and videos in their computers.

We want them to know that they have a choice to decide to view the images or not, and because they have chosen to view these child pornographic images, they are victimizing each child viewed. Bring back the pain and suffering these children have already had to endure.

Our justice system needs to protect these children from the preying eyes and hands of these perverts because they can't fight back or don't know how to. Our justice system needs to understand that there's a victim in each of these images.

And each time a picture is downloaded, these children are victimized again and again. Please help these

perverted individuals understand the significance of what they are doing, and how each child is a victim because each child has done nothing wrong.

My daughter is the strongest person that I know and I am so proud of her. It is extremely sad to see how this horrible situation continues to beat her down emotionally and physically. She still has trouble sleeping due to nightmares of the horrible trauma she went through and also of new people finding out who she is or unknown people finding her and abusing her.

She also has severe stomach aches and headaches that incapacitate her causing her to miss school and work. I pray that she heals from the trauma that her biological father did to her and from the constant reminder that each of these sick individuals bring with each download.

I also pray for the rest of my family. The crimes against my daughter have had untold affects on our other children, my wife and myself. This living hell that I first mentioned is a day-to-day ordeal that can raise its ugly head at the most inopportune times.

Like my daughter, we are sometimes paralyzed by the trauma that comes from being the parents of a sexually abused child. The sad fact is this doesn't end because my daughter's images will be out on the Internet forever continually reminding her and us of how fragile we all are.

The Internet is such a powerful tool. But child pornography and how it perpetuates the re-victimization of children is an extreme consequence to our society as a whole, but specifically to our vulnerable children. Our society views our children as precious little gifts that we should love and protect.

Some sick, perverted individuals use the Internet as their evil playground to share and use in their sick fantasy world. They choose to do this. They choose to push buttons. They make a decision to download and view.

Actions sometimes have consequences. And when actions like this happen, the consequences should be powerful and lasting. Give my daughter her justice that she may completely heal from this.

Thank you, Your Honor.

THE COURT: Thank you.

MS. CHOU: And the victim has also requested a no contact order be made as part of the Court's order in this case.

And then in terms of restitution, the victim's counsel has asked the government to make an additional argument which is that in addition to the supplemental report by Dr. Green which addresses the Gayland disaggregation issues, the fact of Vicki's original abuse show that it was done for the purpose of distribution of images on the

Internet.

The abuse sessions were scripted and she was required to perform according to script and until she got it right. She was forced to hold up a sign that said NW, Dad, endow. Come and play with us. These facts show that the audience was an essential and motivating factor in the behavior which was filmed.

The Gayland opinion requires the Court consider apportionment of the losses occasioned by original abuse versus image circulation, but it because does not say that in every case there must be apportionment. We believe that where the facts of the abuse was for the purpose of creation of images and distribution, there should be no apportionment. Vicki's abuse is one such case.

In terms of the government's position on restitution, at a minimum the Court should order the attorneys' fees which are directly attributable to this case which was $1750 according to the counsel's submission. The counsel also indicated that $750 in additional attorneys' fees from what they have spent collectively should be apportioned to this case and so that would be $2500.

And the government in conducting the Caroline Gayland analysis submits that out of the total costs that the victim has indicated from the therapeutic counseling, from the educational and vocational counseling, and lost earnings

not including attorneys' fees, the total is over a million and approximately $796,000 have been received.

But to comply with the Gayland disaggregation, if the Court's not inclined to follow the argument of the counsel in finding that all of the losses should be attributable to the harms from the distribution and the downloading of the Internet since that was the original purpose of the crime, the report from the therapist indicates that about ten percent of the counseling costs should be extracted from the overall costs and that the rest can then be apportioned based on the known defendants at this time.

And so the restitution law is a little bit of a morass, but as far as the government making its recommendation, in a past 9th Circuit case In Re Vicki and Amy, it seemed like the best course of action was to subtract out anything that is attributable only to the direct abuse which is the ten percent counseling cost and then divide the rest approximately, which in this case would be $3,430 which would include the $1750 in attorneys' fees, but not the additional $750.

And then so the government submits that would be the minimum based on a general apportionment, but because this defendant's crime is more specifically tied to this victim because of the fact that he had -- was specifically collecting her images, sorting them into a VI folder,

continuing to access that folder as late as 2012 and 2013, and had the lengthier videos with some of specific masochistic images, a potentially higher award could also be appropriate. And the mean amount of restitution award in this case is $13,941.

THE COURT: Tell me that again. The minimum is?

MS. CHOU: The minimum based on a general apportionment would be $3,430 and then an additional $750 for generalized attorneys' fees as requested by the victim's counsel would also be appropriate. And then more than that would move towards the mean award which is $13,941 which would be supported by the sadistic masochistic images that this defendant specifically had as well as the specificity of his crime.

THE COURT: If I were -- given that I've dismissed the distribution charges, what is the minimum restitution that would be available under statute?

MS. CHOU: I don't -- I think it's mandatory restitution.

THE COURT: I know it's mandatory, but what's the minimum mandatory?

MS. CHOU: I don't think there is one specified. The only guidance we have is from Caroline and Gayland that there should be some restitution.

THE COURT: I understand that, but you've lost me.

You started out -- I followed you up to $3,430. Thereafter, I'm completely lost because I don't know how you got to the $13,000 median number. The median of what?

MS. CHOU: That's the median award imposed across all the different cases where there's been restitution awards.

THE COURT: For both cases where the defendant has been convicted of possession and distribution or only --

MS. CHOU: I think it's across all the different types of cases.

THE COURT: I'm sorry?

MS. CHOU: I think it's across both types of convictions.

THE COURT: Okay. So that is the median in cases where there has been conviction of either possession, distribution or both?

MS. CHOU: Yes, Your Honor, or receipt.

THE COURT: Or receipt.

MS. CHOU: But most oftentimes what courts have looked at are the type of images that the defendant held. And while distribution would be aggregated for an even higher award, in this case the possession conduct alone, even without the receipt count, is what ties the defendant to his specific victim because his possession was with the specific folders.

THE COURT: I understand the possession relates to the specific folder. I'm just trying to get a number out of you.

MS. CHOU: I think at least $3,430, Your Honor.

THE COURT: Okay. Thank you.

Mr. Werksman, I know there's going to be an ability to pay issue.

MR. WERKSMAN: I'll be brief, Your Honor. Honestly, I'm more concerned with --

THE COURT: I'm well aware of that.

MR. WERKSMAN: And I don't want to spend too much time, but I would ask the Court to give the lowest possible restitution that the government's requesting and then a little lower and I'll make this argument under Gayland which is the case the government cites. I'm sure the Court's aware there has to be this apportionment.

And the government and Vicki's lawyers, I call her Vicki. That's the only name we have. I don't mean to show disrespect. They're asking for a 90 percent, 10 percent apportionment. Ten percent for the original abuser and 90 percent for all the subsequent viewers.

There have been 639 defendants convicted. First of all, what this young girl suffered is beyond words and I don't take anything away from that.

THE COURT: We all agree with that and thank

goodness she's married and thank goodness some things are hopefully beginning to improve, but she's a victim of a terrible, terrible crime.

MR. LEWIS: Stipulated.

I just need to say this for the record. That the government and Vicki's lawyers are asking for this 90 percent 10 percent apportionment. I would argue that the Court should find the apportionment should be the other way. Because her abuse at the hands of her father and I don't think that can be overstated. And I think in fact, I'm not saying that they're doing anything to conceal that.

In fact the last letter referred to her biological father. The fact that her own father did this abuse is probably a lot more than ten percent of why she's having the problems she's having. And the fact that this stuff happened on the Internet is probably less than 90 percent.

So I just ask the Court that -- the Court has no basis to find a 90 percent, 10 percent apportionment. If anything, it should be a much lower percentage attributed to the viewers because the victimization is off the charts horrendous. This was her own father who did it.

THE COURT: No, I know that.

MR. WERKSMAN: And for that reason, I would ask the Court to view the government's request with an eye towards further discounting from its minimum to something below

$3,430. Otherwise, I would submit, Your Honor.

THE COURT: Well, I think $3,430 is the appropriate restitution and I don't mean to dismiss your arguments, Mr. Werksman, but I think we're all more concerned about what the sentence should be. But we haven't heard from Mr. Gartenlaub if he wishes to be heard.

MR. WERKSMAN: Yes, Your Honor. He'd like to make a short statement.

THE COURT: Okay, sure.

THE DEFENDANT: Thank you, Your Honor.

I appreciate the chance to talk. I've sat through this. I just want to start out and say I'm innocent of all the charges that were both implied upfront and these charges that are now I'm facing. I've always been a loyal American citizen. I worked really hard to get where I was at. I come from a good family, got a bunch of good friends, life-long friends. I'm not the person that can do this.

You know, I did, I lived at the beach, I had a beach house. I had a lot of visitors. I don't know how this got on there. I don't. That's just one option. You know, I was investigated for a national security crime. That goes against everything that I believe in. I stayed at Boeing for years to help protect this country. I was there for over ten years.

Married my beautiful wife who's now here. She was

a little late. I did nothing wrong. I feel honestly, I was racially profiled through my work. I traveled to China to take care of my ailing family, my wife's mother has been very sick. She recently passed away. We went back and forth to do that. I'm family oriented.

Within a month of my wife and I getting married, my mother passed away. My wife wanted me to see my new family. We went over and met them. Got everything approved through work. I followed all the right procedures. I asked for permission. Got approval not only from work, but from the government. Yes, you can travel. I did nothing wrong.

We did go twice. I was told that I could no longer travel foreign to center countries. I chose the ability to see my family as more important than working on a specific program. I mean, less than 5, 10 percent of the entire company work on classified programs so I looked for another job. Took a job working at the Long Beach facility as a manager.

From what I understand, when the government came 18 months later to investigate a national security breach, they were clearly indicated this happened before I had ever even worked at that facility. I tried to help them. I gave them a lot of information and I pointed them towards anything I could do.

It's clear that not only did it happen before I

worked there, I'm clearly was a manager did not have access to data. And if you looked at the data, it was clearly from another division. There's 5,000 people that worked on that program. I don't know how I was singled out.

The government invaded my house multiple times. I know they admitted to coming on the 29th and 30th of January. They were there in my house before that and after that. There's records of my computer being accessed every time I went out of the country.

Um, there's really I don't know how these files got on my computer. I mean it's a horrible tragedy what happened to these kids and continues to happen to these kids, but I'm not the person that did that and I have no interest in it. I'm a loving family guy. I have a great family. I've raised my previous girlfriend's kids, my current -- my wife's kids.

I mean, I'm not that person, ma'am. And I hope you can see that and you have seen the issues with this case. And I do appreciate your consideration, ma'am. Thank you.

THE COURT: Okay. Thank you.

All right. Well, let me just try to correct one thing. I think when we began I said the Offense Level was 33 because that's what the revised letter said. I think in light of the order vacating the lesser included offense, there should be minus four so that the Offense Level is 29. Do we all agree with that?

MR. WERKSMAN: Yes, Your Honor.

THE COURT: Criminal History Category of one, which would yield the advisory range of 87 to 108 months. Does the government agree with that?

MR. LEWIS: Yes, Your Honor.

THE COURT: As I've indicated and I'm not gonna go over everything again, I think that there is a reason for a variance in this case because of the unusual factors and I am prepared to vary to an Offense Level of 22 which would yield a 41 to 51 month advisory range.

I previously said 42 months. Actually, I'm going to impose the low end of that range which is 41 months. I had misrecorded the months and the range. So 41 months is what I'm going to imposition.

I am doing that because of the unique features of this case and the fact that I don't think there's anything quite comparable with it or close to being comparable with it. And I also think that in light of the history and characteristics of Mr. Gartenlaub, a sentence of 41 months is more than significant.

It is a sentence that serves all the purposes of Section 3553 and it -- I don't think that we will see him in court again. I don't think he -- as Mr. Werksman has pointed out, he's lost his job. He is going to have to register as a sex offender the balance of his life and that's a very harsh

punishment for someone. And if you add to that 41 months in custody, it seems to me that that is an appropriate sentence. That's what I intend to do.

And if there's nothing further to be said by anyone, I will proceed to read the sentence.

MR. LEWIS: Your Honor, I would just ask for purposes of the record, is the Court adopting the factual findings in the PSR specifically as to the objections raised by the defense?

THE COURT: Yes, I am.

MR. WERKSMAN: Your Honor, we're deemed to have made all of our objections?

THE COURT: Yes. You're deemed to have made all of your objections and they're set forth in your objections to the presentence report and all other objections are preserved for appeal.

MR. WERKSMAN: Thank you.

THE COURT: Okay. It is ordered that the defendant shall pay to the United States a special assessment of $100, which is due immediately. Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons Inmate Financial Responsibility Program.

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that such sanction would place an undue burden on the defendant and his dependents.

The Court is going to order restitution in the amount of $3,430 and it will be payable, could you tell me, Ms. Chou to whom?

MS. CHOU: To Carol L. Hepburn In Trust for Vicki at 200 First Avenue West, Suite 500, Seattle, Washington.

THE COURT: Thank you.

The defendant shall comply with General Order No. 01-05. I think I already said that.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the Defendant Keith Gartenlaub is hereby committed on Count 2 of the two count indictment to the custody of the Bureau of Prisons for a term of 41 months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of life under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation Office, General Order 05-02, General Order 01-05 including the three special conditions delineated in General Order 01-05.

2. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to

one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter not to exceed eight tests per month as directed by the probation officer.

3. The defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath and/or sweat patch testing as directed by the probation officer.

The defendant shall abstain from using alcohol and illicit drugs and from abusing prescription medications during the period of supervision.

4. During the course of supervision, the probation officer with the agreement of the defendant and defense counsel may place the defendant in a residential drug treatment program approved by the United States Probation Office for treatment of narcotic addiction or drug dependency which may include counseling and testing to determine if the defendant has reverted to the use of drugs.

And the defendant shall reside in the treatment program until discharged by the program director and probation officer.

5. As directed by the probation officer, the defendant shall pay all or part of the costs of defendant's substance abuse treatment and mental health treatment to the aftercare contractors during the period of community supervision.

Pursuant to Title 18 United States Code Section 3672, the defendant shall provide payment and proof of payment as directed by the probation officer.

6. During the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment and the same will apply to restitution.

7. The defendant shall cooperate in the collection of a DNA sample from the defendant.

8. The defendant shall possess and use only those computers, computer-related devices, streaming domains, passwords, email accounts and Internet service providers ISPs that have been disclosed to the probation officer upon commencement of supervision.

Any changes or addictions are to be disclosed to the probation officer prior to the first use.

Computers and computer-related devices include personal computers, personal data assistants (PDAs), Internet appliances, electronic games, cellular telephone and digital storage media as well their peripheral equipment that can access or can be modified to access the Internet, electronic bulletin boards and other computers.

9. All computers, computer-related devices and their peripheral equipment used by the defendant shall be subject to search and seizure. This shall not apply to items

used at the employment site which are maintained and monitored by the employer.

10. The defendant shall comply with the rules and regulations of the Computer Monitoring Program. The defendant shall pay the cost of the Computer Monitoring Program in an amount not to exceed $32 per month per device connected to the Internet.

11. The defendant shall register as a sex offender and keep the registration current in each jurisdiction where he resides, where he is an employee and where he is a student to the extent the registration procedures have been established in each jurisdiction.

When registering for the first time, the defendant shall also register in the jurisdiction in which the conviction occurred in different from his jurisdiction of residence.

The defendant shall provide proof of registration to the probation officer within three days of release from imprisonment.

12. The defendant shall participate in a psychological, counseling or psychiatric treatment or a sex offender treatment program as approved and directed by the probation officer. The defendant shall abide by all rules, requirements and conditions of such program.

13. The defendant shall not view or possess any

materials including pictures, photographs, books, writings, drawings, videos or video games depicting and/or describing sexually explicit conduct as defined at Title 18 United States Code Section 2256(2).

14. The defendant shall not view or possess any materials including pictures, photographs, books, writings, drawings, videos or video games depicting and/or describing child pornography as defined at Title 18 United States Code Section 2256(8).

This condition does not prohibit the defendant from possessing materials solely because they are necessary to or used for a collateral attack. Nor does it prohibit him from possessing materials prepared and used for the purposes of his court-mandated sex offender treatment when the defendant's treatment provider or the probation officer has approved of his possession of the materials in advance.

15. The defendant shall not own, use or have access to the services of any commercial mail receiving agency nor shall he open or maintain a post office box without the prior written approval of the probation officer.

16. The defendant shall not frequent or loiter within 100 feet of schoolyards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities or other places primarily used by persons under the age of 18 unless the defendant receives written permission from the probation

officer.

17. The defendant shall not associate or have verbal, written, telephonic or electronic communication with any person under the age of 18 except (A) in the presence of the parent or legal guardian of said minor and (B) on the condition that the defendant notifies said patient or legal guardian of his conviction in the instant offense.

This provision does not encompass persons under the age of 18 such as waiters, cashiers, ticket vendors, et cetera whom the defendant must interact with in order to obtain ordinary and usual commercial services.

18. The defendant shall not affiliate with, own control, volunteer or be employed in any capacity by a business and/or organization that causes the defendant to regularly contact persons under the age of 18.

19. The defendant shall not affiliate with, own, control or be employed in any capacity by a business whose principal product is the production or selling of materials depicting or describing sexually explicit conduct as defined in Title 18 United States Code Section 2256(2).

20. The defendant's employment shall be approved by the probation officer and any change in employment should be pre-approved by the probation officer.

The defendant shall submit the name and address of the proposed employer to the probation officer at least ten

days prior to any scheduled change.

21. The defendant submit his person and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media and effects to search at any time with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant or by any probation officer in the lawful discharge of the officer's supervision function.

The Court authorizes the Probation Office to disclose the presentence report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency.

Further redisclosure of the presentence report by treatment provider is prohibited without the consent of the sentencing judge.

The Court further authorizes the Probation Office to disclose the presentence report and/or any previous mental health evaluations or reports to the meant health treatment provider. The treatment provider may provide information excluding the presentence report to state or local social service agencies such as the State of California Department of Social Services for the purpose of the client's rehabilitation.

Okay. In addition, Mr. Werksman, this is, I guess, for you. Is your client potentially eligible for the 500-hour drug and alcohol program?

MR. WERKSMAN: Can he be evaluated, Your Honor? I was going to ask you to strike the drug and alcohol --

THE COURT: Yeah, I know. Well, that's the problem here. I don't know of any drug and alcohol issues and if there aren't any, that's fine.

MR. WERKSMAN: There aren't any.

THE COURT: Okay. I think we should strike those provisions because I think that may make a difference in terms of everything else. So to the extent that I have included Conditions 3, 4 and 5 previously articulated are hereby stricken and they will not appear in the J and C. I think those are the ones we're talking about. Yeah, 3, 4 and 5 seem to be the ones.

Two I think he has to do a drug test. There's not a basis for waiving Condition 2 regarding a drug test 15 days after release; is that correct?

MS. CHOU: I believe so, Your Honor.

THE COURT: What?

MS. CHOU: I believe Your Honor is correct. I don't think there's a basis to.

THE COURT: Yeah, I think we're stuck with that one, but I think 3, 4 and 5 should be stricken.

And then in turn, the language that the authorization for the probation officer to disclose the presentence report to the substance abuse treatment provider, that provision should be stricken at the end. No, I think that stays because there is a treatment provider unrelated to alcohol and drugs so let's leave that in.

Okay. Then I guess notwithstanding those exclusions from the order, the Court directs the BOP to evaluate Mr. Gartenlaub to see if he's eligible for the BOP's 500-hour drug and alcohol program, but I leave that to the discretion of BOP.

Mr. Gartenlaub, I'm going to talk about surrender in a minute so let's do that first, but, obviously, I know you intend to appeal from this sentence and you must do so within 14 days of today. And if you cannot afford to pay for counsel, counsel will be provided for you.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Mr. Werksman, what do we want to do about surrender here?

MR. LEWIS: Your Honor, I would request the Court grant him bail pending appeal. He has been out on 325,000 bond.

THE COURT REPORTER: I'm sorry, counsel. I can't hear you over there.

MR. LEWIS: Would the Court consider releasing him? Would Your Honor consider this a motion for bail pending appeal? He's had no problems. He's never missed a court appearance. It's been two years. He's on a $325,000 appearance bond. This case presents all the appropriate issues for 9th Circuit review. He's been very responsible in the way he's dealt with this entire case. Now, I request that the Court allow him to remain on bond pending appeal.

THE COURT: I think we may have to have a separate hearing on that because I think what the government's going to say is that there is a risk of flight.

MR. LEWIS: There is a risk of flight, but, Your Honor, there are also specific statutory factors that there must either be a substantial question of law or fact resulting in a reversal, new trial.

THE COURT: It falls under a presumption.

MR. LEWIS: A and B, Your Honor.

THE COURT: That may be the problem, Mr. Werksman. I don't think I can make the findings there's a substantial chance of reversal. You know, obviously, a court may disagree with me. I think I can't make the findings. I didn't realize we were going to fall under provision. But if you need an extended period to surrender, I'm prepared to entertain that.

MR. WERKSMAN: Would Your Honor allow him 60 days

to surrender so he can begin working with appellate counsel?

THE COURT: Yes.

MR. LEWIS: No objection, Your Honor.

MR. WERKSMAN: While we're dealing with the housekeeping matters, would the Court please recommend that he be housed in Southern California.

THE COURT: Yes.

MR. WERKSMAN: And also, Your Honor, his cousin Lyle is in court today. His son is being Bar Mitzvah'd this weekend in Bakersfield, which is in the Eastern District of California. Would the Court allow Mr. Gartenlaub to attend?

He'll be with family from this Friday, which is September 2nd through Sunday, September 5th. As long as he gives Pretrial Services his itinerary and whereabouts and he'll be in the company of family members.

THE COURT: I have no objection to that. My only point is let's be sure are we out of the land of Pretrial Services and into the land of Probation, that's my only question. I think you've got to go talk to Probation. You can represent that I will support his being able to attend the Bar Mitzvah.

MR. WERKSMAN: Thank you, Your Honor.

THE COURT: Let's find out does the government object?

MR. LEWIS: The government does not object assuming

it's by ground transportation to get there.

MR. WERKSMAN: Yes, it would be. He'd drive.

THE COURT: I don't know how else you get to Bakersfield. Ms. Jeang who is ever helpful suggests that maybe you should submit a proposed order.

MR. WERKSMAN: I'll do that. Thank you, Your Honor.

THE COURT: Okay. Anything further for now everyone?

MR. WERKSMAN: No, Your Honor. We just need the Court to give us a surrender date.

THE COURT: What about October 31st at noon?

MR. WERKSMAN: That's fine, Your Honor. Thank you.

THE COURT: Ms. Jeang was wanting me to clear, I had stricken Condition No. 5 which goes to mental health treatment. I'm not sure maybe we should be striking that. We should only be striking 3 and 4 or amending it so it says costs of defendant's mental health treatment rather than substance abuse and mental health.

MR. LEWIS: Government agrees with that.

THE COURT: Okay.

MR. WERKSMAN: That's fine, Your Honor.

Last question. Would the Court grant him any pre-custody credit based upon his two years of home detention?

THE COURT: No.

MR. WERKSMAN: Thank you.

THE COURT: Thank you.

MR. LEWIS: Your Honor, one last matter from the government, which is at the last hearing the government had raised the fact that materials that were subject to the protective order appeared in a couple of articles at that point. Since that hearing they've appeared in another and the government understood the Court was willing to revisit that at the time when the appeal was going to be pending and the court's record was essentially all the issue was going to be.

So the government would ask the Court to order that the defense return the discovery to the government who will make it available going forward in the appeal at the time of the self-surrender.

MR. WERKSMAN: My only concern, Your Honor, is first of all, I've had nothing to do with or didn't even know there were any problems since the one addressed at the last appearance when some newspaper article referenced --

THE COURT: The Washington Post article.

MR. WERKSMAN: And that had nothing to do with me, but Your Honor, I'm just concerned that he does have appellate counsel I'm told is going to step in. There's an organization that wants to do the appeal I'm told.

THE COURT: I understand.

MR. WERKSMAN: And they're going to need the discovery and I want to make sure they're not deprived of it and create some undue burden on appellate counsel.

THE COURT: I understand and I think what I understand the government to be saying is that this discovery should be returned, but then made available to appellate counsel.

MR. LEWIS: Yes, Your Honor.

THE COURT: I think the problem is there are probably forces at work beyond your control, my control and perhaps even Mr. Gartenlaub's control and what the government is asking is that the material subject to the protective order be returned. If you will be good enough to identify appellate counsel once you have appellate counsel in place, I will order the government within five days to give that discovery to appellate counsel.

MR. WERKSMAN: Well, then so would the Court then order me to turn the discovery back over to the government?

THE COURT: I'm going to order you to turn the discovery back over to the government and upon appointment or retention of appellate counsel, the government shall have five days to turn the discovery over to appellate counsel for use in the appeal and not for any other purpose.

MR. LEWIS: And that it will remain subject to the

terms of the previous protective order.

THE COURT: Yes.

MR. WERKSMAN: Well, I think the government should enter a new protective order.

THE COURT: Actually, you know what? I think that's right. You're gonna have to negotiate the new protective order with new counsel because I don't think I have -- I don't even know who the counsel is, I don't know what their concerns are and for me to sit here today and order that set of attorneys to abide by the protective order that Mr. Werksman voluntarily entered into with you, I think is overreaching.

MR. LEWIS: Understood. After the discovery is returned, the parties will present to the Court a new protective order?

THE COURT: Well, to the Circuit. I don't think you'll give it to me. Won't it go to the appellate court?

MR. LEWIS: Yes, Your Honor, we can do it that way.

THE COURT: I think that's the appropriate way to do it because once the judgment is entered and the appeal is filed, I think they're in charge.

MR. LEWIS: Understood.

MR. WERKSMAN: My only concern is once I turn the discovery back over, I'll be powerless over it.

THE COURT: Certainly, until such time as I lose

jurisdiction, I will direct that the discovery be turned over. So if you appellate counsel in place in next few days and then, obviously, notify the government then the government's gonna have to give it back. But I am assuming that it's being turned over for use in the appeal and not for some other purpose. And I am also assuming that appellate counsel and the government will negotiate a new protective order.

MR. WERKSMAN: Very well. Will the Court give me a few days. I need to go back to my office and gather all this stuff. Maybe Friday afternoon?

MR. LEWIS: No objection.

THE COURT: Bond is exonerated upon surrender.

And I guess the question is where Mr. Gartenlaub would surrender in the absence of designation? I imagine there will be a designation then. The surrender is to the U.S. Marshal located at the United States District Court 3470 12th Street G-122 Riverside, California 92501.

MR. WERKSMAN: Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings were concluded at 2:42 p.m.)

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES )
) SS.
STATE OF CALIFORNIA )

I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES.

DATE: OCTOBER 7, 2016

/s/ LAURA MILLER ELIAS

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**United States of America,**
Plaintiff-Appellee,

v.

**Keith Gartenlaub,**
Defendant-Appellant.

Case No. 24-7437

---------------------------------------------

**EXHIBIT B**

**NOTICE OF FILING MOTIONS TO QUASH, SUPRESS FISA, TRAVERSE, AND FRANKS**

**2015-02-02**

**Submitted in Support of:**
**Motion to Reconsider Application for Leave to File Second or Successive Motion Under 28 U.S.C. § 2255**

Mark J. Werksman, Esq. (SBN 120767)
Kelly C. Quinn, Esq. (SBN 197697)
LAW OFFICE OF MARK J. WERKSMAN
888 West Sixth Street, Suite f0, Los Angeles, CA 90017
Tel. (213) 688-0460/Fax. (213) 624-1942

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br><br>PLAINTIFF(S)<br>v.<br>KEITH P. GARTENLAUB<br><br>DEFENDANT(S). | CASE NUMBER:<br>14-CR-00173<br><br>**NOTICE OF MANUAL FILING OR LODGING** |

PLEASE TAKE NOTICE:

Pursuant to Local Rule 5-4.2, the following document(s) or item(s) are exempt from electronic filing, and will therefore be manually ☐ Filed ☑ Lodged: **(List Documents)**

1. Ex Parte Application and Proposed Order Requesting Permission to File Motion to Quash Under Seal; MOTION TO QUASH SEARCH WARRANTS SA14-315M, SA14-316M, SA14-317M, SA14-318M;
2. Ex Parte Application and Proposed Order Requesting Permission to File FISA Motion Under Seal; MOTION FOR DISCLOSURE AND MOTION TO SUPPRESS; 3. Ex Parte Application and Proposed Order Requesting Permission to File Motion To Traverse Under Seal; MOTION TO TRAVERSE SEARCH WARRANTS SA14-315M, SA14-316M, SA14-317M, SA14-318M, AND REQUEST FOR FRANKS HEARING.

**Reason:**

☑ Under Seal
☐ In Camera
☐ Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)
☐ Electronic versions are not available to filer
☐ Per Court order dated: ____________
☐ Administrative Record
☐ Other:

February 2, 2015
Date

Mark J. Werksman
Attorney Name

Keith P. Gartenlaub
Party Represented

*Note: File one Notice of Manual Filing or Lodging in each case, each time you manually submit a document(s).*

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**United States of America,**
Plaintiff-Appellee,

v.

**Keith Gartenlaub,**
Defendant-Appellant.

Case No. 24-7437

---------------------------------------------

**EXHIBIT C**

**GOVT UNCLASSIFIED_DISCLOSURE OF FISA**

**May 4, 2015**

**Submitted in Support of:**
**Motion to Reconsider Application for Leave to File Second or Successive Motion Under 28 U.S.C. § 2255**

STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ANTHONY J. LEWIS (Cal. Bar No. 231825)
Assistant United States Attorney
National Security Section
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-1786
Facsimile: (213) 894-6436
E-mail: anthony.lewis@usdoj.gov
CASEY ARROWOOD
Trial Attorney
Counterespionage Section
National Security Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH PRESTON GARTENLAUB,<br><br>Defendant. | No. SA CR 14-173-CAS<br><br>GOVERNMENT'S UNCLASSIFIED MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR DISCLOSURE OF FISA MATERIAL AND MEMORANDUM OF POINT AND AUTHORITIES TO SUPPRESS THE FRUITS OR DERIVATIVES OF ANY EVIDENCE COLLECTED PURSUANT TO FISA OR ANY OTHER FOREIGN INTELLIGENCE GATHERING |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Anthony Lewis, hereby files the Government's Unclassified Memorandum in Opposition to Defendant's Motion for Disclosure of FISA Material and Memorandum of Point and Authorities to Suppress the Fruits or Derivatives of Any Evidence Collected Pursuant to FISA or Other Foreign Intelligence Gathering.

This memorandum in opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 4, 2015

Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

/s/
ANTHONY LEWIS
Assistant United States Attorney

CASEY ARROWOOD
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION PAGE

## TABLE OF CONTENTS


I. Introduction .......... 1
A. Background .......... 2
B. Overview of the FISA Authorities .......... 3
1. **[CLASSIFIED MATERIAL REDACTED]** .......... 3
2. The FISC's Findings .......... 3
II. The FISA Process .......... 4
A. Overview of FISA .......... 4
B. The FISA Application .......... 6
1. The Certification .......... 8
2. Minimization Procedures .......... 9
3. Attorney General's Approval .......... 10
C. The FISC's Orders .......... 10
III. District Court Review of FISC Orders .......... 15
A. The Review Is to Be Conducted In Camera and Ex Parte .......... 16
1. In Camera, Ex Parte Review is the Rule .......... 18
2. In Camera, Ex Parte Review is Constitutional .......... 23
B. The District Court's Substantive Review .......... 25
1. Standard of Review .......... 25
2. Probable Cause Standard .......... 27
3. Standard of Review of Certifications .......... 28
4. FISA is Subject to the "Good-Faith" Exception .......... 30
IV. The FISA Information Was Lawfully Acquired and the Electronic Surveillance and Physical Searches Were Made in Conformity with an Order of Authorization or Approval .......... 32
A. The Instant FISA Applications Met FISA's Probable Cause Standard .......... 32
1. **[CLASSIFIED MATERIAL REDACTED]** .......... 32
2. **[CLASSIFIED MATERIAL REDACTED]** .......... 32
3. **[CLASSIFIED MATERIAL REDACTED]** .......... 32
a. **[CLASSIFIED MATERIAL REDACTED]** .......... 32
b. **[CLASSIFIED MATERIAL REDACTED]** .......... 32
c. Conclusion: The Information Acquired from the Targeted Facilities, Places, Property, or Promises Was Lawfully Acquired .......... 32

## TABLE OF CONTENTS


DESCRIPTION PAGE

B. The Certifications Complied with FISA ................. 33
1. Foreign Intelligence Information ................. 33
2. "A Significant Purpose" ........................... 33
3. Information Not Reasonably Obtainable Through Normal Investigative Techniques .......... 33
C. **[CLASSIFIED MATERIAL REDACTED]** ........................ 33
D. All Electronic Surveillance and Physical Searches Were Conducted in Conformity with an Order of Authorization or Approval ............................ 33
1. The Standard Minimization Procedures ............. 34
2. The FISA Information Was Appropriately Minimized . 39
3. **[CLASSIFIED MATERIAL REDACTED]** .................. 40
V. The Court Should Reject the Defendant's Legal Arguments .... 40
A. The Defendant's Constitutional Arguments Lack Merit ... 40
1. The FISA Applications Were Not Based Solely on Protected First Amendment Activity ............... 41
2. The Probable Cause Standard of FISA Complies with the Fourth Amendment's Reasonableness Requirement ...................................... 41
3. The Court's In Camera and Ex Parte Review Comports with the Fifth Amendment's Due Process and Sixth Amendment's Counsel and Confrontation Clauses ............................ 43
B. The Defendant Has Not Established Any Basis to Disclose the FISA Materials ........................... 45
C. The Defendant Has Not Established Any Basis for the Court to Conduct a Franks Hearing ............. 48
D. The Defendant Has Not Established Any Basis for the Court to Suppress the FISA information ............ 52
VI. Conclusion: There is No Basis to Disclose the FISA Materials, to Conduct a Franks Hearing, or to Suppress the FISA Information ........................................ 53




Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE**

FEDERAL CASES

ACLU Found. of So. Cal. v. Barr, 952 F.2d 457 (D.C. Cir. 1991) .......... 23, 33

CIA v. Sims, 471 U.S. 159 (1985) .......... 21, 22

Franks v. Delaware, 438 U.S. 154 (1978) .......... 28, 49, 50

Halperin v. CIA, 629 F.2d 144 (D.C. Cir. 1980) .......... 22

In re Grand Jury Proceedings of the Spec. Apr. 2002 Grand Jury, 347 F.3d 197 (7th Cir. 2003) .......... 19, 29

In re Kevork, 634 F. Supp. 1002 (C.D. Cal. 1985), aff'd, 788 F.2d 566 (9th Cir. 1986) .......... 20, 35

In re Sealed Case, 310 F.3d 717 (FISA Ct. Rev. 2002) .......... 27, 34, 35, 42

Massachusetts v. Sheppard, 468 U.S. 981 (1984) .......... 31

Phillippi v. CIA, 655 F.2d 1325 (D.C. Cir. 1981) .......... 21

San Francisco Arts & Athletics, Inc., v. United States Olympic Comm., 483 U.S. 522 (1987) .......... 40

Scott v. United States, 436 U.S. 128 (1978) .......... 38

United States v. Abu-Jihaad, 531 F. Supp. 2d 299 (D. Conn. 2008), aff'd, 630 F.3d 102 (2d Cir. 2010) .......... passim

United States v. Ahmed, No. 1:06-CR-147, 2009 U.S. Dist. Lexis 120007 (N.D. Ga. Mar. 19, 2009) .......... 26, 27, 28, 29, 31, 55



Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES


DESCRIPTION PAGE

FEDERAL CASES CONT'D

United States v. Alwan, No. 1:11-CR-13, 2012 WL 399154 (W.D. Ky. Feb. 7, 2012) ... 29

United States v. Badia, 827 F.2d 1458 (11th Cir. 1987) ... 20, 28, 29, 41

United States v. Belfield, 692 F.2d 141 (D.C. Cir. 1982) ... passim

United States v. Benkahla, 437 F. Supp. 2d 541 (E.D. Va. 2006) ... 24, 44

United States v. Bin Laden, 126 F. Supp. 2d 264 (S.D.N.Y. 2000) ... 34, 35

United States v. Butenko, 494 F.2d 593 (3th Cir. 1974), cert. denied sub nom. Ivanov v. United States, 419 U.S. 881 (1974) ... 53

United States v. Campa, 529 F.3d 980 (11th Cir. 2008) ... 28, 29

United States v. Canfield, 212 F.3d 713 (2d Cir. 2000) ... 31

United States v. Cavanagh, 807 F.2d 787 (9th Cir. 1987) ... 27, 28, 42

United States v. Colkley, 899 F.2d 297, (4th Cir. 1990) ... 49

United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008) ... 49

United States v. Damrah, 412 F.3d 618 (6th Cir. 2005) ... 23, 43, 53

United States v. Daoud, 2014 WL 321384 (N.D. Ill. Jan. 29, 2014), rev'd 755 F.3d 479, (7th Cir. 2014) ... passim




Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

DESCRIPTION PAGE

FEDERAL CASES CONT'D

United States v. Duggan,
743 F.2d 59 (2d Cir. 1984) ... 17, 18, 28, 29, 30, 31, 42, 46

United States v. Duka,
671 F.3d 329 (3d Cir. 2011) .................... 16, 28, 30

United States v. El-Mezain,
664 F.3d 467 (5th Cir. 2011) ........ 16, 17, 18, 19, 23, 28

United States v. Falcone,
364 F. Supp. 877 (D.N.J. 1973),
aff'd, 500 F.2d 1401 (3rd Cir. 1974) ................. 38, 39

United States v. Falvey,
540 F. Supp. 1306 (E.D.N.Y. 1982) ................ 24, 43, 45

United States v. Garcia,
413 F.3d 201 (2d Cir. 2005) ............................ 30

United States v. Gowadia,
No. 05-00486, 2009 WL 1649714
(D. Haw. June 8, 2009) ............................ 19, 23

United States v. Hammoud,
381 F.3d 316 (4th Cir. 2004), rev'd on other grounds,
543 U.S. 1097 (2005), op. reinstated in pertinent part,
405 F.3d 1034 (4th Cir. 2005) ................ 26, 35, 37, 38

United States v. Hassoun,
No. 04-60001, 2007 WL 1068127
(S.D. Fla. Apr. 4, 2007) .......................... 20, 51

United States v. Hill,
459 F.3d 966, (9th Cir. 2006) .......................... 27

United States v. Hussein,
No. 13CR1514-JM, 2014 WL 1682845
(S.D. Cal. April 29, 2014) ............................ 44

United States v. Isa,
923 F.2d 1300 (8th Cir. 1991) ................... 19, 38, 44



Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

DESCRIPTION PAGE

FEDERAL CASES CONT'D


United States v. Islamic Am. Relief Agency, No. 07-00087-CR-W-NKL, 2009 WL 5169536 (W.D. Mo. Dec. 21, 2009) ................. 17, 21, 29, 30, 38

United States v. Jamal, 2011 U.S. Dist. LEXIS 12224 (D. Az. February 11, 2011) ... 44

United States v. Jayyousi, No. 04-60001, 2007 WL 851278 (S.D. Fla. Mar. 15, 2007), aff'd, 657 F.3d 1085 (11th Cir. 2011) ................ 19, 24

United States v. Joseph, 709 F.3d 1082 (11th Cir. 2013) .......................... 27

United States v. Kabir, 5:12-CR-00092-VAP, Doc. No. 277 (C.D. Cal., May 5, 2014) ............................ 24, 26

United States v. Kashmiri, No. 09-CR-830-4, 2010 WL 4705159 (N.D. Ill. Nov. 10, 2010) ........ 17, 18, 19, 26, 29, 30, 51

United States v. Ketzeback, 358 F.3d 987 (8th Cir. 2004) ............................ 49

United States v. Krupa, 658 F.3d 1174 (9th Cir. 2011) ............................ 26

United States v. Lahiji, 2013 WL 550492 (D. Or. February 12, 2013) ................ 44

United States v. Leon, 468 U.S. 897 (1984) ............................ 30, 31, 54

United States v. Martin, 615 F.2d 318 (5th Cir. 1980) ............................ 49

United States v. Medunjanin, No. 10-CR-19-1, 2012 WL 526428 (S.D.N.Y. Feb. 16, 2012) ............................ 39, 47

United States v. Megahey, 553 F. Supp. 1180 (E.D.N.Y. 1982) ..................... 24, 44




Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

DESCRIPTION PAGE

FEDERAL CASES CONT'D


United States v. Mihalik, 11-CR-833(A), Doc. No. 108 (C.D. Cal., Oct. 3, 2012) .... 50

United States v. Mohamud, No. 3:10-CR-00475-KI-1, 2014 WL 2866749 (D.Or., June 24, 2014) .... 47

United States v. Mubayyid, 521 F. Supp. 2d 125 (D. Mass. 2007) .... 19, 36, 38, 43, 51, 52, 55

United States v. Nicholson, No. 09-CR-40, 2010 WL 1641167 (D. Or. Apr. 21, 2010) .... 17, 18, 19, 24, 26, 29, 44, 55

United States v. Ning Wen, 477 F.3d 896 (7th Cir. 2007) .... 30, 42, 54

United States v. Ott, 827 F.2d 473 (9th Cir. 1987) .... 21, 23

United States v. Pelton, 835 F.2d 1067 (4th Cir. 1987) .... 16, 43

United States v. Rahman, 861 F. Supp. 247 (S.D.N.Y. 1994), aff'd, 189 F.3d 88 (2d Cir. 1999) .... 13, 29, 34, 36

United States v. Robinson, 724 F.3d 878 (7th Cir. 2013) .... 27

United States v. Rosen, 447 F. Supp. 2d 538 (E.D. Va. 2006) .... 13, 18, 19, 26, 29, 36

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) .... 35

United States v. Sattar, No. 02-CR-395, 2003 WL 22137012 (S.D.N.Y. 2003) .... 19

United States v. Sherifi, 793 F. Supp. 2d 751 (E.D.N.C. 2011) .... 28, 29




Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

DESCRIPTION PAGE

FEDERAL CASES CONT'D


United States v. Shnewer, 2008 U.S. Dist. LEXIS 112001, at 38 (2009) .......... 49, 51

United States v. Spanjol, 720 F. Supp. 55 (E.D. Pa. 1989), *aff'd*, 958 F.2d 365 (3d Cir. 1992) .................. 18, 19, 23, 53

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) .............................. 19

United States v. Thomson, 752 F. Supp. 75 (W.D.N.Y. 1990) .............. 19, 20, 35, 37

United States v. United States District Court, 407 U.S. 297 (1972) .......................... 28, 37, 41, 42

United States v. U.S. Gypsum Co., 333 U.S. 364 (1948) ...................................... 30

United States v. Warsame, 547 F. Supp. 2d 982 (D. Minn. 2008) .................. *passim*

United States v. Yunis, 867 F.2d 617 (D.C. Cir. 1989) ............................ 22




Exhibit A – Supporting Material Only – Not a Motion

## TABLE OF AUTHORITIES

DESCRIPTION PAGE

U.S. CONSTITUTION

Amend. I .................................13, 40, 41, 45, 48

Amend. IV ....................24, 27, 30, 37, 40, 41, 42, 43, 44

Amend. V ......................................40, 43, 45

Amend. VI ..................................40, 43, 44, 45

Amend. XIV ..............................................84

FEDERAL STATUTES

50 U.S.C. § 1801 ...............................passim

50 U.S.C. §§ 1801-1812 ..............................1

50 U.S.C. § 1803 .................................4,5

50 U.S.C. § 1804 ...............................passim

50 U.S.C. § 1805 ........................14, 20, 23, 24

50 U.S.C. § 1806 ...............................passim

50 U.S.C. § 1821 ...............................passim

50 U.S.C. §§ 1821-1829 ...........................1, 2

50 U.S.C. § 1823 .........................6, 8, 9, 10

50 U.S.C. § 1824 .....................5, 6, 10, 13, 14

50 U.S.C. § 1825 ...............................passim

Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001) ...........4

OTHER AUTHORITIES

Fed. R. Crim. P. 41 ....................................27

H.R. Rep. No. 95-1283, 95th Cong., 2d Sess., Pt. 1 (1978) ..........................35, 36, 37, 39

S. Rep. No. 95-701, 95th Cong., 2d Sess. (1978) ..............................37, 38, 42, 46, 47



Exhibit A – Supporting Material Only – Not a Motion

## I. INTRODUCTION

The Government is filing this unclassified memorandum in opposition to defendant Keith Preston Gartenlaub's (Gartenlaub) Motion for Disclosure and Memorandum of Point and Authorities to Suppress the Fruits or Derivatives of Any Evidence Collected Pursuant to FISA or Other Foreign Intelligence Gathering (defendant's motion) (Docket Entry (Doc.) 70). The defendant seeks: (1) disclosure of the documents underlying electronic surveillance and physical searches conducted pursuant to the Foreign Intelligence Surveillance Act (FISA) (i.e., the FISA materials); and (2) suppression of any evidence derived from FISA search or surveillance (i.e., the FISA information). Doc. 70 at pp. 2-3.[1]

**[CLASSIFIED MATERIAL REDACTED]**[2,3]

For the reasons set forth below and from the Court's in camera, ex parte review of the FISA materials submitted herewith, it is conclusively established that: (1) the electronic surveillance and physical searches at issue were both lawfully authorized and lawfully

[1] **[CLASSIFIED MATERIAL REDACTED]**

[2] The provisions of FISA that address electronic surveillance are found at 50 U.S.C. §§ 1801-1812; those that address physical searches are found at 50 U.S.C. §§ 1821-1829. These two sets of provisions are in many respects parallel and almost identical. Citations herein are generally to the two sets of provisions in parallel, with the first citation being to the relevant electronic surveillance provision, and the second citation being to the relevant physical search provision.

[3] The Attorney General's affidavit ("Declaration and Claim of Privilege") is filed both publicly and as an exhibit in the Sealed Appendix to this unclassified filing. See Sealed Exhibit 1.

conducted in compliance with FISA; (2) disclosure to the defendant of the FISA materials and the Government's classified submissions is not authorized because the Court is able to make an accurate determination of the legality of the surveillance and searches without disclosing the FISA materials or portions thereof; (3) the fruits of the electronic surveillance and physical searches should not be suppressed; (4) the defendant's motion should be denied to the extent that it seeks disclosure of FISA materials; and (5) no hearing is required.

**A. BACKGROUND**

**[CLASSIFIED MATERIAL REDACTED]**

On August 27, 2014, pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), the United States provided notice to the defendant that it "intends to offer into evidence, or otherwise use or disclose in any proceedings in the above-captioned matter, information obtained or derived from electronic surveillance and physical search conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA), as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829." Doc. 9. On February 2, 2015, the defendant filed, under seal, his motion which seeks, among other things, disclosure of the FISA materials and suppression of the FISA information. Doc. 70.

**[CLASSIFIED MATERIAL REDACTED]**[4]

[4] As a result of the redactions, the pagination and footnote numbering of the classified memorandum and the unclassified memorandum are different.

In subsequent sections of this Memorandum, the Government will: (1) present an overview of the FISA authorities at issue in this case; (2) discuss the FISA process; (3) address the manner in which the Court should conduct its in camera, ex parte review of the FISA materials; (4) summarize the facts supporting the FISC's probable cause determinations at issue (all of which information is contained fully in the exhibits in the Sealed Appendix); (5) discuss the relevant minimization procedures; and (6) address the defendant's arguments in support of his motion. All of the Government's pleadings and supporting FISA materials are being submitted not only to oppose the defendant's motion, but also to support the United States' request, pursuant to FISA, that this Court: (1) conduct an in camera, ex parte review of the FISA materials; (2) find that the FISA information at issue was lawfully acquired and that the electronic surveillance and physical searches were conducted in conformity with an order of authorization or approval; (3) deny the defendant's request that the FISA information be suppressed; and (4) order that none of the FISA materials be disclosed to the defense, and instead, that they be maintained by the United States under seal.

**B. OVERVIEW OF THE FISA AUTHORITIES**

**[CLASSIFIED MATERIAL REDACTED]**

**1. [CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

**2. The FISC's Findings**

**[CLASSIFIED MATERIAL REDACTED]**



Exhibit A – Supporting Material Only – Not a Motion

## II. THE FISA PROCESS

### A. OVERVIEW OF FISA

Enacted in 1978, and subsequently amended, FISA authorizes the Chief Justice of the United States to designate eleven United States District Judges to sit as judges of the FISC. 50 U.S.C. § 1803(a)(1). The FISC judges are empowered to consider ex parte applications submitted by the Executive Branch for electronic surveillance and physical searches when a significant purpose of the application is to obtain foreign intelligence information, as defined in FISA. Rulings of the FISC are subject to review by the Foreign Intelligence Surveillance Court of Review (FISC of Review), which is composed of three United States District or Circuit Judges who are designated by the Chief Justice. 50 U.S.C. § 1803(b).

As originally enacted, FISA required that a high-ranking member of the Executive Branch of Government certify that "the purpose" of the FISA application was to obtain foreign intelligence information. In 2001, FISA was amended as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA PATRIOT Act").[5] One change to FISA accomplished by the USA PATRIOT Act is that a high-ranking official is now required to certify that the acquisition of foreign intelligence information is "a significant purpose" of the requested surveillance. 50 U.S.C. § 1804(a)(6)(B).

[5] Pub. L. No. 107-56, 115 Stat. 272 (2001).



Exhibit A – Supporting Material Only – Not a Motion

FISA provides that the Attorney General may authorize the emergency employment of electronic surveillance and physical searches if the Attorney General

> (A) reasonably determines that an emergency situation exists with respect to the employment of electronic surveillance [or physical search] to obtain foreign intelligence information before an order authorizing such surveillance can with due diligence be obtained;
>
> (B) reasonably determines that the factual basis for the issuance of an order under this title to approve such electronic surveillance [or physical search] exists;
>
> (C) informs, either personally or through a designee, a judge having jurisdiction under [50 U.S.C. § 1803] at the time of such authorization that the decision has been made to employ emergency electronic surveillance [or physical search]; and
>
> (D) makes an application in accordance with this title to a judge having jurisdiction under section 103 as soon as practicable, but not later than seven days after the Attorney General authorizes such electronic surveillance [or physical search].

50 U.S.C. §§ 1805(e)(1), 1824(e)(1).[6] Emergency electronic surveillance or physical searches must comport with FISA's minimization requirements, which are discussed below. 50 U.S.C. §§ 1805(e)(2), 1824(e)(2).[7]

---

[6] **[CLASSIFIED MATERIAL REDACTED]**

[7] If no FISC order authorizing the electronic surveillance or physical searches is issued, emergency surveillance or searches must terminate when the information sought is obtained, when the FISC denies an application for an order, or after the expiration of seven days from the time of the emergency employment, whichever is earliest. See 50 U.S.C. §§ 1805(e)(3), 1824(e)(3). Moreover, if no FISC order is issued, absent a showing of good cause, the FISC shall cause to be served on any U.S. person named in the application, and

*(footnote cont'd on next page)*



Exhibit A – Supporting Material Only – Not a Motion

**B. <u>THE FISA APPLICATION</u>**

FISA provides a statutory procedure whereby the Executive Branch may obtain a judicial order authorizing the use of electronic surveillance, physical searches, or both, within the United States where a significant purpose is the collection of foreign intelligence information.[8] 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B). Under FISA, "[f]oreign intelligence information" means:

> (1) information that relates to, and if concerning a United States person[9] is necessary to, the ability of the United States to protect against –
>
> > (A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;
> >
> > (B) sabotage, international terrorism, or the international proliferation of weapons of mass destruction by a foreign power or an agent of a foreign power; or
> >
> > (C) clandestine intelligence activities by an intelligence service or network of a foreign power or

---

others in the FISC's discretion, notice of the fact of the application, the period of the surveillance, and the fact that during the period information was or was not obtained. <u>See</u> 50 U.S.C. § 1806(j); <u>see also</u> 50 U.S.C. § 1824(j)(1) (physical searches). In addition, if no FISC order is issued, neither information obtained nor evidence derived from the emergency electronic surveillance or physical search may be disclosed in any court or other proceeding, and no information concerning a United States person acquired from the electronic surveillance or physical search may be used in any other manner by Federal officers or employees without the person's consent, except with the approval of the Attorney General if the information indicates a threat of death or serious bodily harm. <u>See</u> 50 U.S.C. §§ 1805(e)(5), 1824(e)(5).

[8] **[CLASSIFIED MATERIAL REDACTED]**

[9] **[CLASSIFIED MATERIAL REDACTED]**

Case 8:14-cr-00073-CAS Document 324 Filed 09/07/25 Page 177 of 190 Page ID #:4688

by an agent of a foreign power; or

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to -

(A) the national defense or the security of the United States; or

(B) the conduct of the foreign affairs of the United States.

50 U.S.C. § 1801(e). See also 50 U.S.C. § 1821(1), adopting the definitions from 50 U.S.C. § 1801. With the exception of emergency authorizations, FISA requires that a court order be obtained before any electronic surveillance or physical searches may be conducted.

An application to conduct electronic surveillance pursuant to FISA must contain, among other things:

(1) the identity of the federal officer making the application;

(2) the identity, if known, or a description of the specific target of the electronic surveillance;

(3) a statement of the facts and circumstances supporting probable cause to believe that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(4) a statement of the proposed minimization procedures to be followed;

(5) a description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance;

(6) a certification, discussed below, of a high-ranking official;

(7) a summary of the manner or means by which the electronic surveillance will be effected and a statement

whether physical entry is required to effect the electronic surveillance;

(8) the facts concerning and the action taken on all previous FISA applications involving any of the persons, facilities, or places specified in the application; and

(9) the proposed duration of the electronic surveillance.

50 U.S.C. § 1804(a)(1)-(9).

An application to conduct a physical search pursuant to FISA must contain similar information as an application to conduct electronic surveillance except that an application to conduct a physical search must also contain a statement of the facts and circumstances that justify an applicant's belief that "the premises or property to be searched contains foreign intelligence information" and that each "premises or property to be searched is or is about to be, owned, used, possessed by, or is in transit to or from" the target. 50 U.S.C. §§ 1823(a)(1)-(8).

**1. <u>The Certification</u>**

An application to the FISC for a FISA order must include a certification from a high-ranking executive branch official with national security responsibilities that:

(A) the certifying official deems the information sought to be foreign intelligence information;

(B) a significant purpose of the surveillance is to obtain foreign intelligence information;

(C) such information cannot reasonably be obtained by normal investigative techniques;

(D) designates the type of foreign intelligence information being sought according to the categories described in [50 U.S.C. §] 1801(e); and

> (E) includes a statement of the basis for the certification that –
>
> > (i) the information sought is the type of foreign intelligence information designated; and
> >
> > (ii) such information cannot reasonably be obtained by normal investigative techniques.

50 U.S.C. § 1804(a)(6); <u>see also</u> 50 U.S.C. § 1823(a)(6).

**2. <u>Minimization Procedures</u>**

The Attorney General has adopted, and the FISC has approved, minimization procedures that regulate the acquisition, retention, and dissemination of non-publicly available information concerning unconsenting United States persons obtained through FISC-approved electronic surveillance or physical searches, including persons who are not the targets of the FISA authorities. FISA requires that such minimization procedures be:

> reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. §§ 1801(h)(1), 1821(4)(A).

In addition, minimization procedures also include "procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes." 50 U.S.C. §§ 1801(h)(3), 1821(4)(c).



Exhibit A – Supporting Material Only – Not a Motion

Case 8:14-cr-00173-CAS Document 324 Filed 05/01/25 Page 21 of 70 Page ID #:4691

[CLASSIFIED MATERIAL REDACTED]

3. **Attorney General's Approval**

FISA further requires that the Attorney General approve applications for electronic surveillance, physical searches, or both, before they are presented to the FISC.

C. **THE FISC'S ORDERS**

Once approved by the Attorney General, the application is submitted to the FISC and assigned to one of its judges. The FISC may approve the requested electronic surveillance, physical searches, or both, only upon finding, among other things, that:

> (1) the application has been made by a "Federal officer" and has been approved by the Attorney General;
>
> (2) there is probable cause to believe that (A) the target of the electronic surveillance and/or physical search is a foreign power or an agent of a foreign power, and that (B) the facilities or places at which the electronic surveillance is directed are being used, or are about to be used, by a foreign power or an agent of a foreign power (or that the premises or property to be searched is, or is about to be, owned, used, possessed by, or is in transit to or from, a foreign power or an agent of a foreign power);
>
> (3) the proposed minimization procedures meet the statutory requirements set forth in 50 U.S.C. § 1801(h) (electronic surveillance) and 50 U.S.C. § 1821(4) (physical search);
>
> (4) the application contains all of the statements and certifications required by Section 1804 or Section 1823; and
>
> (5) if the target is a United States person, that the certifications are not clearly erroneous.

50 U.S.C. §§ 1805(a)(1)-(4), 1824(a)(1)-(4).

FISA defines "foreign power" to mean –

> (1) a foreign government or any component, thereof, whether or not recognized by the United States;
>
> (2) a faction of a foreign nation or nations, not substantially composed of United States persons;
>
> (3) an entity that is openly acknowledged by a foreign government or governments to be directed and controlled by such foreign government or governments;
>
> (4) a group engaged in international terrorism or activities in preparation therefor,
>
> (5) a foreign-based political organization, not substantially composed of United States persons;
>
> (6) an entity that is directed and controlled by a foreign government or governments; or
>
> (7) an entity not substantially composed of United States persons that is engaged in the international proliferation of weapons of mass destruction.

50 U.S.C. §§ 1801(a)(1)-(7); see also 50 U.S.C. § 1821(1), adopting definitions from 50 U.S.C. § 1801.

"Agent of a foreign power" means –

> (1) any person other than a United States person, who—
>
> > (A) acts in the United States as an officer or employee of a foreign power, or as a member of a foreign power as defined in subsection (a)(4);
> >
> > (B) acts for or on behalf of a foreign power which engages in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person may engage in such activities in the United States, or when such person knowingly aids or abets any person in the conduct of such activities or knowingly conspires with any person to engage in such activities;

(C) engages in international terrorism or activities in preparation therefore [sic];

(D) engages in the international proliferation of weapons of mass destruction, or activities in preparation therefor; or

(E) engages in the international proliferation of weapons of mass destruction, or activities in preparation therefor for or on behalf of a foreign power; or

(2) any person who -

(A) knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

(B) pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

(C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power;

(D) knowingly enters the United States under a false or fraudulent identity for or on behalf of a foreign power or, while in the United States, knowingly assumes a false or fraudulent identity for or on behalf of a foreign power; or

(E) knowingly aids or abets any person in the conduct of activities described in [the subparagraphs above] . . . or knowingly conspires with any person to engage in activities described in [the subparagraphs above.]

50 U.S.C. §§ 1801(b)(1) and (2); see also 50 U.S.C. § 1821(1), adopting definitions from 50 U.S.C. § 1801.

FISA specifies that no United States person may be considered a foreign power or an agent of a foreign power solely on the basis of activities protected by the First Amendment to the Constitution of the United States. 50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A). Although protected First Amendment activities cannot form the sole basis for FISC-approved electronic surveillance or physical searches, they may be considered by the FISC if there is other activity indicative that the target is an agent of a foreign power. United States v. Rosen, 447 F. Supp. 2d 538, 549-50 (E.D. Va. 2006); United States v. Rahman, 861 F. Supp. 247, 252 (S.D.N.Y. 1994), aff'd, 189 F.3d 88 (2d Cir. 1999). Additionally, FISA provides that "[i]n determining whether or not probable cause exists . . . a judge may consider past activities of the target, as well as facts and circumstances relating to current or future activities of the target." 50 U.S.C. §§ 1805(b), 1824(b).

If the FISC has made all of the necessary findings and is satisfied that the FISA application meets the statutory provisions, the FISC issues an ex parte order approving the electronic surveillance, physical searches, or both, requested in the application. 50 U.S.C. §§ 1805(a), 1824(a). The order must specify:

> (1) the identity, if known, or a description of the specific target of the collection;
>
> (2) the nature and location of each facility or place at which the electronic surveillance will be directed or of each of the premises or properties that will be searched;
>
> (3) the type of information sought to be acquired and



Exhibit A – Supporting Material Only – Not a Motion

the type of communications or activities that are to be subjected to the electronic surveillance, or the type of information, material, or property that is to be seized, altered, or reproduced through the physical search;

(4) the manner and means by which electronic surveillance will be effected and whether physical entry will be necessary to effect that surveillance, or a statement of the manner in which the physical search will be conducted;

(5) the period of time during which electronic surveillance is approved and/or the authorized scope of each physical search; and

(6) the applicable minimization procedures.

50 U.S.C. §§ 1805(c)(1) and 2(A); 1824(c)(1) and 2(A).

Under FISA, electronic surveillance or physical searches targeting a United States person may be approved for up to ninety days, and those targeting a non-United States person may be approved for up to one-hundred and twenty days. 50 U.S.C. §§ 1805(d)(1), 1824(d)(1).[10] Extensions may be granted, but only if the United States submits another application that complies with FISA's requirements. An extension for electronic surveillance or physical searches targeting a United States person may be approved for up to ninety days, and one targeting a non-United States person may be approved for up to one year.[11] 50 U.S.C. §§ 1805(d)(2), 1824(d)(2).

[10] **[CLASSIFIED MATERIAL REDACTED]**

[11] The FISC also retains the authority to review, before the end of the authorized period of electronic surveillance or physical searches, the Government's compliance with the requisite minimization procedures. 50 U.S.C. §§ 1805(d)(3), 1824(d)(3).

### III. DISTRICT COURT REVIEW OF FISC ORDERS

FISA authorizes the use of information obtained or derived from any FISC-approved electronic surveillance or physical search in a criminal prosecution, provided that advance authorization is obtained from the Attorney General, 50 U.S.C. §§ 1806(b), 1825(c), and that proper notice is subsequently given to the court and to each aggrieved person against whom the information is to be used.[12] 50 U.S.C. §§ 1806(c), (d), 1825(d), (e). Upon receiving notice, an aggrieved person against whom the information is to be used may move to suppress the use of the FISA information on two grounds: (1) that the information was unlawfully acquired; or (2) that the electronic surveillance or physical search was not conducted in conformity with an order of authorization or approval. 50 U.S.C. §§ 1806(e), 1825(f). In addition, FISA contemplates that a defendant may file a motion or request under any other statute or rule of the United States to discover or obtain applications or orders or other materials relating to electronic surveillance or physical searches, i.e., the FISA materials, 50 U.S.C. §§ 1806(f), 1825(g). When a defendant moves to suppress FISA information under 50 U.S.C.

[12] An "aggrieved person" is defined as the target of electronic surveillance or "any other person whose communications or activities were subject to electronic surveillance," 50 U.S.C. § 1801(k), as well as "a person whose premises, property, information, or material is the target of physical search" or "whose premises, property, information, or material was subject to physical search. 50 U.S.C. § 1821(2). Gartenlaub is an "aggrieved person" under FISA, and was provided with notice of his status as such and of the Government's intent to use FISA-obtained or -derived information against him at trial.

§§ 1806(e) or 1825(f), or seeks to discover the FISA materials under some other statute or rule, the motion or request is evaluated using FISA's probable cause standard, which is discussed below, and not the probable cause standard applicable to criminal warrants. See, e.g., United States v. El-Mezain, 664 F.3d 467, 564 (5th Cir. 2011); United States v. Duka, 671 F.3d 329, 336-37 (3d Cir. 2011) (rejecting appellant's challenge to FISA's probable cause standard because it does not require any indication that a crime has been committed); United States v. Pelton, 835 F.2d 1067, 1075 (4th Cir. 1987).

### A. THE REVIEW IS TO BE CONDUCTED IN CAMERA AND EX PARTE

In assessing the legality of FISC-approved electronic surveillance and physical searches, or both, the district court,

> shall, notwithstanding any other law, if the Attorney General files [as he has filed in this proceeding] an affidavit or declaration under oath that disclosure or an adversary hearing would harm the national security of the United States, review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted.[13]

50 U.S.C. §§ 1806(f), 1825(g). On the filing of the Attorney General's affidavit or declaration, the court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance [or physical search] only

[13] **[CLASSIFIED MATERIAL REDACTED]**

where such disclosure is necessary to make an accurate determination of the legality of the surveillance [or search]."[14] 50 U.S.C. §§ 1806(f), 1825(g) (emphasis added). Thus, the propriety of the disclosure of any FISA applications or orders to the defendant may not even be considered unless and until the district court has first concluded that it is unable to make an accurate determination of the legality of the acquired collection after reviewing the Government's submissions (and any supplemental pleadings that the district court may request) in camera and ex parte. See United States v. Daoud, 755 F.3d 479, 481-82 (7th Cir. 2014); El-Mezain, 664 F.3d at 565; United States v. Abu-Jihaad (Abu-Jihaad II), 630 F.3d 102, 129 (2d Cir. 2010); United States v. Belfield, 692 F.2d 141, 147 (D.C. Cir. 1982); United States v. Nicholson, No. 09-CR-40, 2010 WL 1641167, at *4 (D. Or. Apr. 21, 2010) ("After an in-camera review, the court 'has the discretion to disclose portions of the documents, under appropriate protective procedures, only if [the court] decides that such disclosure is necessary to make an accurate determination of the legality of the surveillance.'") (quoting United States v. Duggan, 743 F.2d 59, 78 (2d Cir. 1984); United States v. Kashmiri, 2010 WL 4705159, at *2 (N.D. Ill. Nov. 10, 2010); United States v. Islamic

[14] In United States v. Warsame, 547 F. Supp. 2d 982, 987 (D. Minn. 2008), the court addressed the meaning of "necessary" in this context: "[t]he legislative history explains that such disclosure is 'necessary' only where the court's initial review indicates that the question of legality may be complicated" by factual misrepresentations, insufficient identification of the target, or failure to comply with the minimization standards in the order.

Am. Relief Agency ("IARA"), No. 07-00087-CR-W-NKL, 2009 WL 5169536, at *3-4 (W.D. Mo. Dec. 21, 2009).

If the district court is able to make an accurate determination of the legality of the electronic surveillance, physical searches, or both, based on its in camera, ex parte review of the materials submitted by the United States, then the court may not order disclosure of any of the FISA materials to the defense, unless otherwise required by due process. Daoud, 755 F.3d 479, 484-85; El-Mezain, 664 F.3d at 566; Duggan, 743 F.2d at 78; Kashmiri, 2010 WL 4705159, at *2.

**1. In Camera, Ex Parte Review is the Rule**

Federal courts have repeatedly and consistently held that FISA "anticipates that an ex parte, in camera determination is to be the rule," with disclosure and an adversarial hearing being the "exception, occurring only when necessary." Belfield, 692 F.2d at 147 (emphasis in original); accord, El-Mezain, 664 F.3d at 567 ("[D]isclosure of FISA materials is the exception and ex parte, in camera determination is the rule") (citing Abu-Jihaad II, 630 F.3d at 129); Duggan, 743 F.2d at 78; Rosen, 447 F. Supp. 2d at 546; Nicholson, 2010 WL 1641167 at *3-4; United States v. Spanjol, 720 F. Supp. 55, 59 (E.D. Pa. 1989), aff'd, 958 F.2d 365 (3d Cir. 1992).

In fact, every court but one that has addressed a motion to disclose FISA materials or to suppress FISA information has been able to reach a conclusion as to the legality of the FISA collection at

issue based on its in camera, ex parte review.[15] See, e.g., El-Mezain, 664 F.3d at 566 (quoting district court's statement that no court has ever held an adversarial hearing to assist the court); In re Grand Jury Proceedings of the Special Apr. 2002 Grand Jury ("In re Grand Jury Proceedings"), 347 F.3d 197, 203 (7th Cir. 2003) (noting that no court had up to that time ordered disclosure of FISA materials); United States v. Isa, 923 F.2d 1300, 1306 (8th Cir. 1991); Spanjol, 720 F. Supp. at 58-59; United States v. Sattar, No. 02-CR-395, 2003 WL 22137012, at *6 (S.D.N.Y. 2003) (citing Nicholson, 955 F. Supp. at 592 & n. 11 (noting "this court knows of no instance in which a court has required an adversary hearing or disclosure in determining the legality of a FISA surveillance"); United States. v. Stewart, 590 F.3d 93 (2d Cir. 2009); United States v. Thomson, 752 F. Supp. 75, 79 (W.D.N.Y. 1990); Abu-Jihaad I, 531 F. Supp. 2d at 310; United States v. Mubayyid, 521 F. Supp. 2d 125, 130 (D. Mass. 2007); Rosen, 447 F. Supp. 2d at 546; United States v. Gowadia, No. 05-00486, 2009 WL 1649714, at *2 (D. Haw. June 8, 2009); Kashmiri, 2010 WL 4705159, at *2-3; United States v. Jayyousi, No. 04-60001, 2007 WL 851278, at *7-8 (S.D. Fla. Mar. 15, 2007), aff'd, 657 F.3d 1085 (11th

---

[15] The district court in United States v. Daoud, No. 12-CR-723 (N.D. Ill. Jan. 29, 2014), ruled that it was capable of making the determination, but nevertheless ordered the disclosure of FISA materials. The Government appealed the Daoud court's order to the U.S. Court of Appeals for the Seventh Circuit, which overturned the district court's decision to disclose, stating, "[s]o clear is it that the materials were properly withheld from defense counsel that there is no need for a remand to enable the district judge to come to the same conclusion, because she would have to do so." Daoud, 755 F.3d at 485.

Cir. 2011);[16] United States v. Hassoun, 2007 WL 1068127, *4 (S.D. Fla. April 2, 2007); United States v. Badia, 827 F.2d 1458, 1463 (11th Cir. 1987).

As the Court will see from its examination of the exhibits in the Sealed Appendix, there is nothing extraordinary about the instant FISC-approved electronic surveillance and physical searches that would justify the production and disclosure of highly sensitive and classified material or the suppression of the FISA-obtained or -derived evidence. The FISA materials are well-organized and easily reviewable by the Court in camera and ex parte, and they are fully and facially sufficient to allow the Court to make an accurate determination that the FISA information was lawfully acquired and that the electronic surveillance and physical searches were made in conformity with an order of authorization or approval. In other words, the materials presented "are straightforward and readily understood." In re Kevork, 634 F. Supp. 1002, 1008 (C.D. Cal. 1985), aff'd, 788 F.2d 566 (9th Cir. 1986). Moreover, as in other cases, "[t]he determination of legality in this case is not complex." Belfield, 692 F.2d at 147; see also Warsame, 547 F. Supp. 2d at 987 ("issues presented by the FISA applications are straightforward and uncontroversial"); Abu-Jihaad I, 531 F. Supp. 2d at 310; Thomson, 752 F. Supp. at 79. This Court, much like the aforementioned courts, is

---

[16] All citations to Jayyousi herein are to the Magistrate Judge's Report and Recommendation which was adopted and incorporated into the District Court's Opinion.



Exhibit A – Supporting Material Only – Not a Motion